Good morning, everyone. We have five cases on today's oral argument calendar, and we'll begin in Appeals No. 23-2641 and 23-2642, the United States v. Kendrick and Kenwin Frazier. Mr. DiSalvo. Good morning, Your Honors. May it please the Court, Stephen DiSalvo on behalf of Kendrick Frazier and Kenwin Frazier. A series of errors infecting the Fraziers' convictions and sentences for federal kidnapping were laid out in the briefing. I'm happy to address any questions about those issues this morning, but I'd like to focus on three in particular. First, because it is an issue common to both Fraziers, I want to begin with sentencing. The Frazier sentences are based on a four-level enhancement for which there's no evidentiary support. Second, Kendrick Frazier was denied his Sixth Amendment right to counsel of choice. And third, the evidence is insufficient to sustain Kendrick Frazier's conviction, whether on a direct or aiding and abetting theory. So I'll begin with the sentencing issue first. The District Court applied a four-level sentencing enhancement for a victim who sustained permanent or life-threatening bodily injury. And in the sentencing guidelines, the definition for a permanent or life-threatening bodily injury is an injury involving a substantial risk of death, a loss or substantial impairment of a function of a bodily organ or member or mental faculty that's likely to be permanent, or an obvious disfigurement that's likely to be permanent. On the evidentiary record, both at trial and at sentencing, there is no evidence that would support applying that standard to find that the victim did suffer a permanent or life-threatening injury. And a lot of the conduct that was cited was just that, conduct. It wasn't actually an injury. And under well-settled precedent, especially in other circuits, it's really by the words of the statute, the sentencing guidelines, it's really the injury itself that you have to focus on and not all the conduct. So here, when you parse through what the District Court did, the District Court said, well, there was a witness who said that someone had been shot on his porch. But when you actually look at what the testimony was and what that witness ended up saying on the stand, and said to investigators before the trial, is that he actually didn't see anything because he was inside of his apartment. He just came out afterwards and said spontaneously that that's what happened because he didn't really quite understand what was going on. But it's a little bit more than just that. We have the ring doorbell evidence where it's clear Kendrick discharged the firearm. And then we have uncontroverted testimony that the victim had blood on his face. And we know there was blood on the sidewalk, an extensive amount of blood on the sidewalk. So it's a little bit more than just a witness saying, I saw him shot, and then saying, well, maybe I didn't see the actual shooting. So Your Honor, there's a couple... And it's clearly erroneous. It's the standard of review of factual determinations. So Your Honor, if the court improperly calculated the guidelines by applying wrong enhancement, that would be de novo review. But I agree that the factual findings are reviewed for clear air. In terms of the video, I don't think there's any dispute that a gun was discharged, but there's also no dispute that you can't see in the video whether someone was struck. So that leaves the blood that you mentioned... It leaves circumstantial evidence. I don't even know that you can infer from that that someone was or wasn't shot. In fact, from the evidence, and you can see this on the video... You don't think it's sufficient given that he had blood on his face, there was an extensive amount of blood on the sidewalk from where he ran away, that a reasonable inference could be drawn that he was shot? No, Your Honor. And the reason is this... By a preponderance of the evidence, which is the standard. That's correct. No, you cannot. And the reason is because it's undisputed that Mr. Eastman was bleeding before the gun went off. That is undisputed. Witnesses testified that there was a small puddle of blood in the bathroom of the apartment before Eastman was brought outside of the apartment, and there was blood going down the stairs. And the blood that was washed off or hosed off the sidewalk is also undisputed by multiple witnesses to have been trickles of blood here and there across sidewalks. Because that blood was undisputed before the gunshot... No, hold on. There were witnesses who testified that the blood was so extensive they had to hose it off. No, Your Honor. There was a witness who said that he was hosing off the sidewalk for a period of time, but it's not clear... Because he also testified it was just trickles of blood, it's not clear what exactly he was hosing off or why. But given the circumstances of when the blood arose, I don't think this court or the district court could conclude, even by a province of the evidence, that the blood was from a gunshot. And in fact, you could see in the video that after the gunshot goes off, Mr. Eastman, within a few seconds, jumps to his feet voluntarily and runs away and says, don't shoot me. And so based on those facts, it's sort of implausible that he was shot at close range. What everyone agrees would have been a close range shot in the head, and those circumstances resulted. At best, the evidence might allow you to infer that there was a warning shot that went off, that there was a gunshot near him, that there was a loud effect. But there's no evidence to show, even by a proponent of the evidence, that he suffered a life-threatening injury. And in fact, the Fifth Circuit stated in an unprecedented decision, United States v. Cox, that even if the victim were shot, you'd still need further evidence that the gunshot was, in fact, a life-threatening or permanent injury. In that case, there was a bullet that clipped the victim's kidney, and they said that that, even on plain air review, was a murder. Suppose that we disagree with your characterization and assessment of the facts. And I know that's not your position, but further suppose that we conclude that the district court committed no clear error in finding that there was a gunshot somewhere around the head or neck area. Is the evidence you're just talking about direct? You're saying from there we need direct evidence of a life-threatening or permanent injury against the backdrop of the hypothetical finding that I just outlined? So, Your Honor, if I understand your question correctly, you're saying if there was a gunshot, evidence of a gunshot. Yeah, assume contrary to your argument that we do not find clear error with the district court's finding of a gunshot to the head or neck area. Got it. Then what? Your Honor, our position would be there, there's still insufficient evidence to show what the nature of the injury was. Was he shot in the lip? Was he shot in the ear? Was he shot? So, how do you recommend that we articulate that legal standard? Your Honor, I think the legal standard, it's not so much the legal standard as it is what the evidence is. A lot of the evidence here, and even what you've recited, is really evidence of conduct. There needs to be evidence of an injury. And here, the problem we're having is that there's no evidence of an injury. Well, certainly the blood and the amount of blood is evidence of an injury. Your Honor, that's correct except that the blood, because he was bleeding before the gunshot, there's no way to say beyond even by promise of the evidence that it was due to the gunshot. And in fact, the circumstances that happened after the gun was discharged would suggest that it wasn't. So, even if this Court finds that there was insufficient evidence to support that, the heir was not harmless under this Court's precedent, and it should be sent back for resentencing. But the Court should also go further, at least as to Kendrick, and overturn the conviction, vacate the conviction, because he was denied his Sixth Amendment right to counsel of choice. Under the Sixth Amendment, there's a right to be able to choose who you want to represent you. And that right is not, as the Supreme Court has said in Gonzales-Lopez, is not so much about ensuring a fair trial, but is really about ensuring that a defendant understands and believes that they have the best person for them, the person that they want. Mr. DiSalvo, on the Sixth Amendment right, there are two prongs when determining whether or not the defendant waived his right to conflict-free counsel. And the first one is whether or not he knowingly and intelligently waived the conflict. You've argued that an abuse of discretion standard applies to our review of that, but I don't know if you've looked at our opinion in Vizcarra-Milan, which suggests to me that, and I'll ask the same question of the government, that to no vote review applies to that first prong rather than abuse of discretion. Can you respond to that, please? So Your Honor, I think in this circumstance where it appears that the district court applied a heightened standard, it would be essentially de novo review to say, did you apply the right legal test? Assuming that the legal test, you've determined now what the legal test is, or let's say the district court did apply the right legal test, which I don't think it did here, then... You argued for abuse of discretion, though, which is why I'm trying to clarify. Because I think our case law says on that first prong, whether or not he knowingly and intentionally waived the conflict, that we look at it de novo. The second prong, whether a district court can act in its discretion, I think abuse of discretion does apply. Yes, Your Honor. I believe de novo review does apply here, including because a heightened standard was applied to a knowing and intelligent waiver. And that's likely why most of the review for these types of issues receive that type of treatment, because it often is a question of whether too much was required or too little, depending on which side of the case you're on. Your Honor... I don't read our case law's hint about that, but go ahead. Your Honor, in terms of the knowing and intelligent waiver, the issue here is really that a heightened standard, as I mentioned, was applied. And to be clear, in most of the cases that come before the court, the shoe is really on the other foot. There is a defendant who the district court found did have a knowing and intelligent waiver, and they are found guilty, and they come up on appeal, and they challenge that waiver. And in cases like Castillo and Flores, the court has found that even saying, you understand this conflict exists, you understand this conflict, and you understand your right to counsel of choice, but given that, you want to waive it. And yes, yes, yes, just simple responses were enough to constitute a knowing and intelligent waiver. Let me ask you a more practical question. Why did Mr. Brindley not submit a written waiver? And is there anything in the record that shows us that he had a good reason for not complying with the court's order that he do so? So Your Honor, this issue did come up at the hearing. The court had ordered a written waiver. When they got to the oral hearing, the court had noted that they had not been submitted, and there was a discussion with counsel about whether they needed to do that. The court agreed at that time that they, including with the government, that there was no objection to proceeding with an oral waiver because a written waiver was not required. They agreed to follow up afterwards with a written waiver. That's right. But here, because it was already decided at the oral hearing that the court was going to deny it, it's not clear what the benefit would have been to a written waiver. But regardless, there was a written waiver that was ultimately submitted later when new counsel was brought on. That written waiver, I believe, is at Appendix or around Appendix 135. I'm talking about the waiver that Mr. Brindley was ordered to provide and then later agreed to provide. Right. So I believe that because they had agreed, they would proceed orally for now. And then because of the situation that happened at the hearing where the district court was not inclined to grant the waiver, they then did not follow up with the written waiver. But because this court doesn't require written waivers, that should not be an impediment to finding that there was a knowing and intelligent waiver and that there was no actual or serious potential conflict that would prevent or lead to the disqualification of counsel. So Your Honor, on the knowing and intelligent waiver, the real issue is just that if this heightened standard were left intact, it would really be... How would you articulate the heightened, as you put it, the heightened standard? What would you say, how would you describe the standard the district court applied? If you had to capture it in a sentence or two. So I would say that the district court appears to have required that the defendant be able to articulate in his own words what he understands, his rights, and what the nature of the risks and consequences are. This court's already said that that's not required. This court's case law has said that you don't need to give an articulate or even an astute or even show a rudimentary understanding. What it's really about is that the court did not misinform you of your rights and that when you were informed of the rights, you still said you wanted to proceed. Here we have that. We have more than enough to show that. There was a colloquy at Appendix 94 to 95 before. Any questions about what he understood his rights to be? There was a question where he put in his own words what he understood a conflict to be. And then after that, at Appendix 95 to 96, the district court asked questions. And all of the answers were, yes, I want to proceed, yes, I understand the risks, yes, I understand the consequences. Mr. DeSalvo, what, if any, significance or role should the fact that the defendants are brothers play in the legal analysis? Your Honor, the fact that they are brothers lends in favor of the fact that the conflicts should not have been, to find that there would have been cooperation or a conflict, a potential conflict in the future, should be undermined by the fact that they are brothers because it makes it less likely that the two of them would turn on each other. There was no analysis or incorporation of that concept into here, but even if they weren't brothers, there was no evidence that they would cooperate against each other, neither one indicated any indication that they would want to cooperate with the government here and instead wanted to proceed to trial. So there were no actual or serious potential conflicts here. In fact, all the serious potential future conflicts that the district court came up with, none of which were serious, all went to the fact that they all could be undermined by the fact that they were presenting a common defense. So if you're presenting a common defense for both defendants, it's not clear why there would be any conflict that would come up, even if the potential consequences of what could happen from the trial were serious. And Your Honor, with my final minute, I'd like to just touch on the sufficiency of the evidence issue. Multiple courts have held in other circuits that when the holding that is at issue or the restraint is incident to another offense, that that is not enough to satisfy the kidnapping statute. At least as to Kendrick, that is the case here, and this court should reverse his conviction for kidnapping because there's... But that wouldn't be the case on an aiding and abetting theory, even if you're right on the direct kidnapping. If it's an aiding and abetting, his brother in it, that argument would not apply. Your Honor, I believe it still would, and there's a reason for that. The reason is because even on an aiding... There's an ongoing kidnapping with the brother that Kendrick joins, is the government's theory. And he joins as an aider and abetter. So that last part, the joining part, is really the issue here because even on an aiding and abetting theory, you have to have an affirmative act in furtherance of the kidnapping. And so if the intent, and this goes to the second element, the intent, but if the intent was to further some other purpose, which was at best, at worst, an assault, then it wouldn't be in furtherance of the kidnapping, and all the holding that Kendrick would have done was in furtherance, at worst, of assault, not a kidnapping. Do you agree with... When Kendrick showed up at the apartment, do you agree that a rational jury could have found that a kidnapping was underway at that moment? Your Honor, I say I'm into my rebuttal time, but I do not think that at that time, Kendrick had reason to know that a kidnapping was in progress. No, that's not the question I asked. The question I asked is, do you agree that when he showed up as a matter of fact, a rational jury could have concluded that a kidnapping was underway? No. No. Your Honor, if he showed up, first off, when he showed up, Kenwin, his brother, was outside. Other folks were also outside. Mr. Eastman was inside. Do you agree that a jury could have concluded that a kidnapping had occurred sometime prior to that? If he wasn't told how Eastman... I'm not focusing on what he was told. So I think, but that's sort of the issue, right, Your Honor? And I mean, the question is, what did Kendrick understand? If I understand even your question is, could a rational jury find what he understood? But if the issue is where Mr. Eastman was and what... If Mr. Eastman was in the house, and he has no idea how he arrived, and there's no facts about how Mr. Eastman arrived... As you're articulating the facts, what you're doing, in my view, is you're omitting a lot of quite material considerations. For example, what could have been conveyed on the telephone call? What could have been communicated outside? Absolutely, Your Honor. And you can't, under the standard of review, you can't disregard all of that evidence. Your Honor, I agree with you, except there's no evidence of what was said on the call. There's no evidence of what was said outside. Right, but this goes back to your prior point. What you're doing with a lot of these arguments is you're insisting on direct evidence and not recognizing that the law allows findings to be made from circumstantial evidence. Your Honor, this court has said in cases like Jones and Pakowski and other cases, it's not that you need direct evidence. You can infer things from circumstantial evidence, but you have to look at the logical leaps that are making, and every link in that chain needs to be sufficiently strong. Here the point is that when there's absolutely no evidence, you can't just jump to a speculative conclusion because there's conjecture... Absolutely no evidence of what? There's no evidence of what his intent was. Was it an intent to further a kidnapping? No direct evidence. I'll agree with that. And the fact that he did not, he didn't make a statement that was recorded by the doorbell, and there's no wiretap of the telephone. I agree with you there. Your Honor, and I see that my... We're going to give you some rebuttal time. But I think that the issue is, there's, it's not just an issue of, I really think that the issue when it comes down to how you draw the line is, can you say beyond a reasonable doubt that from the evidence that there was a phone call, but we don't know what the content was, that he was outside talking to his brother for seven minutes, but we don't know what was said, that he was actually wanting to further a kidnapping, or was he wanting to further at worst an assault? That's the issue. And I don't know, in my view, the jury could not find beyond a reasonable doubt on that record that it was to further a kidnapping. Okay. We'll give you a couple minutes on rebuttal. Okay, Ms. Summers, good morning. May it please the Court, Counsel. My name is Allie Summers. I represent the United States in this appeal. And I'd like to start piggybacking right off of your question, Your Honor, with regard to the evidence of what Kendrick Frazier's intent was when he went into the apartment and joined in this kidnapping. As you pointed out, there's certainly plenty of circumstantial evidence from which the jury could conclude that his brother Kenwin called him on the cell phone to have him come over to help him in continuing this kidnapping. As you pointed out, he could have been told details of the kidnapping during the phone call, as well as the time that they spent there outside of the apartment before they went in. But I think also on that ring video, there is direct evidence that is corroboration of that reasonable inference, and that is that as soon as Kendrick went into the apartment, you could hear in the video commotion and yelling. The situation immediately escalates. And the witnesses that were there that testified that as soon as Kendrick arrived, the victim locked himself in the bathroom. And I would submit because he knew that he was there to help his brother with this kidnapping. And then Kenwin and Kendrick, doesn't matter who kicked the door in, they kicked the door in and pulled the victim out of that bathroom. And then he pulled him, physically moved his body, the victim's body, down the stairs and out that front door. And you see and hear as he's moving, as he's taking him out that front door, take us to our stuff. He had intention of having the victim accompany him to get the grills that his brother had been demanding for an hour at that point. Am I right on that timeline, Ms. Summers, that from the moment they entered the apartment, Kenwin and Kendrick together, that it was approximately five minutes before they came back outside? That's correct, Your Honor. Okay. 839 to 844. So when, I don't know if it's you or Mr. DeSalvo, but there's characterizations that they went inside, they immediately kicked the bathroom door down, and then they came outside. I don't know how big this apartment is, but it doesn't seem like that would take five minutes. And so, why couldn't a jury have inferred that they did go in and they kicked the bathroom door down, and then they gave Mr. Eastman a few minutes to come up with the jewelry. And when he didn't come up with the jewelry, they drug him outside, and we know what happened from there. I think, Your Honor, from the testimony of Ms. Crawford and Ms. Eckford that were right there, Ms. Crawford testified that she was there when the door was kicked in, and then it fell back on her. She had put herself between the victim and his small child, trying to take the small child. All of that would have taken time, as she kept telling him, just let me get the baby out, let me get the baby out. They're yelling, and you can hear that on that video, because the way the apartment is structured, the stairs straight up to the bathroom at the top of the stairs is right in front of that front doorway. So I do think that from that, it could have been five minutes. I mean, in that time, you know, they were demanding that he get the grills, but I think it's significant that Kendrick physically took the victim down the stairs. You can hear him being dragged down the stairs. Yeah. I don't disagree with you on that. It just seems like five minutes. You haven't even been talking five minutes. Five minutes is an awfully long time to, when somebody is going in, in a small apartment or what I, all the circumstances seem to be, it's a small apartment, to kick down a bathroom door and drag a guy outside, that's a long time. I don't disagree, Your Honor. I think that they definitely, there was a confrontation there in the bathroom, but even regardless of whether there was a confrontation, when he still wasn't producing the grills, he physically moved him out of the apartment and said, I'm, you know, take us to our stuff. Why doesn't that support an assault as opposed to kidnapping? Well, I think that because he, if he wanted to just assault the victim, he had been called over and told that this grills had been stolen, they believed he'd stolen it. He could have just gone in, into the apartment and beat the victim up, put a gun to his face and say, tell me where it is right now, and then leave. But when he didn't, when he didn't produce the grills, he, I think him physically moving his body down the stairs and out the door is evidence of an intention to kidnap and not to assault. I think the assault was an escalation of the kidnapping because when the victim tries to run from him in that 844 video and he tries to bolt and he pulls him back, at that point, now he's, he knows the victim's not going to be compliant with him, he's not going to give him what he's asking for, the purpose of this kidnapping, and I think it's at that point that he decides to more intentionally and more seriously assault the victim. At that point, he puts him down on the ground, you can hear him moaning or begging, saying he hasn't got it, and then he shoots him. So I think it's a kidnapping that, that is an assault escalating the kidnapping. Don't you think the jury could have found that it's both? I, yes, Your Honor. The situation is so volatile that it doesn't, it doesn't lend itself to one conclusion or another that way. They may have, they may have went inside intending to assault him, they may have went inside intending to assault him and continue the kidnapping. In other words, the jury doesn't have to pick, it's not binary like that. That's, I agree, Your Honor. I don't think that the jury had to pick one, and as you pointed out, there was all the evidence of this, the victim having been held, having been taken from his grandmother's house to that apartment and having been held for an hour. All of that was evidence that the jury could consider. But would that go against our case law that says that the kidnapping has to be distinct from the assault or from whatever the other crime is? Well, I think not under an aiding and abetting theory, Your Honor, because he doesn't have to have, as an aider and abetter, we don't have to prove that he participated in each and every element or that he knew the full scope of the kidnapping, only that he, you know, committed an act in furtherance of that kidnapping with intent to, for it to succeed. Can we, once you finish that answer, were you finished? I was finished. Thank you. Can you address Mr. DiSalvo's argument about the blood, there being blood on Mr. Eastman's face as of the time he left the bathroom? And so, you know, it's unclear whether an injury resulted from a shot. Yes, Your Honor. There was one witness, Ms. Crawford, who testified that she did see some blood on the victim's face in the bathroom. I don't recall any testimony of it, blood going down the stairs. This is also not a particularly clean apartment as well. There was no evidence collected along those lines, but there was some testimony in that regard. But her testimony was different than the testimony of the two witnesses outside, Mr. Martin and Ms. Childs, who testified that he was bleeding so much from his face that there were trickles of blood. I know trickles sounds like not a lot, but if you think about how much blood would have to be coming out of a person's body for it to, as he runs, to be on the sidewalk and severed. But could their testimony also be consistent with Ms. Crawford's testimony, that there was some sort of injury at the time of the bathroom, and so that when these neighbors or observers see blood outside, it's not clear to the fact finder whether that blood is from a shot or versus from a pre-existing injury? I don't think so, Your Honor, just because the testimony was that she saw some blood on his face, and then the testimony of the witnesses described much more blood. But in addition to that, the district court also had all of the evidence of what occurred after the victim was shot and got up and ran, and that included that the two defendants got in that same Durango and went in the same direction as the victim in that case, or the victim, and then two hours later, that Durango was burned to the frame, and there were phone calls between Mr. Kenwin and Ms. Edward Moulton, who had rented the vehicle for him. In addition to that, the district judge also had evidence that had been presented at sentencing that that victim had not been seen or heard from since. So from all of that evidence, I think the district court could find that he suffered serious or permanent injury to apply the floor-level enhancement. Do you take the district court's finding to be serious and permanent injury from whatever we think might have happened later or from the shot on the front lawn? I think that... Because in the context of this answer, I want you to address Mr. Estolano's argument that the fact that Mr. Eastman got up and ran should run opposite to the idea that there's a permanent and life-threatening injury from a shot on the front lawn. I think that his conclusion is based on both. In his pronouncement of the sentencing, he does make reference to the fact that he believes that these two were responsible for the death of Mr. Eastman. He chose not to apply the attempt murder or murder cross-reference, but he certainly indicates that he believes they're responsible for that death. So obviously, if they're responsible for his death, there was permanent injury sustained in the course of this kidnapping to support the court's finding for that floor-level enhancement. I did just want to point out a statement of fact that the defense counsel made that is just simply not true. You do not hear the victim, Mr. Eastman, say, don't shoot me on that video. And I would point the court to Governments Exhibits 48 and 49, when right after the shot, you can hear the victim before that speaking clearly, saying he doesn't got it. And then you hear him moaning. He does get up and run. That's certainly true. But he does not say, don't shoot me. I just want to correct that. So with regard to the sufficiency of the evidence, I would like to address first the argument with regard to the evidence of the continued kidnapping and burning of the Durango. Because if this court finds that that evidence was properly admitted, then its analysis of Kendrick's argument of sufficiency of the evidence is significantly impacted. Obviously, at that point, the jury had all three different theories under which they could and did find Kendrick guilty of kidnapping. It is clear from the record below that the defense never made an evidentiary objection to admission of that evidence under Rule 403 or any other rule of evidence. The only objection they made was through a motion for mistrial on the third day of trial in which they argued that admission of that evidence amounted to a constructive amendment to the indictment in violation of their Fifth and Sixth Amendment rights. It was not an evidentiary objection that could in any way have given signal to the district judge that they were making an evidentiary objection based on its prejudicial value relative to its prohibitive or prejudicial effect relative to its prejudicial value. So based on that, because they did not make a specific enough objection, then they forfeited that objection and this court's review on that issue is limited to plain error. There weren't any objections made to that in motions in limine. Were there any 403 objections? There were not, Your Honor, and I'm glad that you raised that. Because there's, the reason I ask is there's a colloquy where they object to the evidence and they refer to same objection that was raised earlier and I'm not sure what the earlier is because there was nothing adjudicated on this in advance. That's correct, Your Honor. They continued to make that objection throughout trial. They were referencing the objection to any admission of the evidence of the continued kidnapping and burning of the Durango, but they didn't make any pretrial motions to bar that evidence. In fact, there was litigation about evidence that the victim had not been seen or heard from since. Right, right. And in that briefing, they actually acknowledged that the government will be offering evidence of this continued, that they chased after him in this rental vehicle and that the vehicle was later burned. So they acknowledged that they knew we intended to introduce that evidence and that theory of a continued kidnapping, but they didn't object to that. And that's in Record 318 in their response to my supplemental motion, or supplemental briefing to their motion in limine. And then, in fact, in the court's order at 334, the court specifically references in a footnote that the government has proffered that it can and will produce this evidence with regard to the continued kidnapping and burning of the Durango. But no objection has been made to that evidence, so this order should not be read to bar that evidence. So they did not make any specific objection under 403 or any other evidentiary rule. So I think that the review is limited to plain error, and I don't think that there is error, much less plain error being that the court should have sua sponte, decide that the evidence was more prejudicial than probative. So, if the court finds that that evidence was admissible, properly admissible, then the jury had more than ample evidence from which to find Kendrick guilty as a principal or as an aider and abetter in all of the facts from the time he was called there by his brother on the cellular telephone, whether they had a conversation on the phone or in front of the apartment, his actions once he went into the apartment, whether it was also an assault, it was clearly part of and an escalation of the kidnapping that was already underway, the jury could have absolutely found that. And if they didn't find it under, convict him under that basis, they could convict him based on the fact that after they shot the victim on that ring video, he, they both got into the Durango, you can see on the next video, both of them getting into the Durango and going after the victim or going in the same direction that he ran. I want to move to the conflict issue. What would someone in Kendrick's position, can someone in Kendrick's position ever waive a conflict? What more would Kendrick have had to do? He did, after all, tell the court, I suppose, you know, we could turn on each other or one lawyer, you know, the lawyer might have to advocate more, might advocate more passionately on behalf, I'm paraphrasing, the ideas that were expressed to the court, more passionately on one other than the other. What more would he have had to do to articulate a knowing waiver? Your Honor, I don't know that there could have been more that he could have given the court to demonstrate a knowing and intelligent waiver. I think in this case, the judge, the district judge was much more concerned with the broader interest of judicial integrity in looking at this case and his evaluation of the appropriateness of joint representation in this case. Would that go to the second prong, though, rather than the knowing and intelligent prong? Yes, it does, Your Honor. I think that it does. I, I, I mean, I just have to honestly answer, I don't believe that . . . That's what I'm looking for. I don't believe that there would be much more that they could have . . . that he could have given. But again, I think that beyond that, in the judge's orders, he said, but even if it is intelligent and knowing that there is a potential for serious, or serious potential for conflict so great that it, it has to yield to the defendant's right to choice of counsel. And again, I think his, his overarching concern was the, the integrity of the judicial process and that if you look at his order, at Doctrine 132, page 21, he says it, even if, even if a conflict does not arise that results in a mistrial, it could certainly affect the integrity of how people view what happens in this courtroom. But even more than that, this may end up being a life or death decision. So it's just not a risk of conflict. It is a great risk of some great punishment for falling one or both of these . . . Why isn't that speculative? Why isn't the reliance on the potential death penalty charges speculative at that point? Because as you know, for the government to bring death penalty charges, there's, you have to go through a lot of process, and you have to get the approval of DOJ, and I didn't see anything or any indication in the record here that that process was ongoing or close to being completed. So it seems a bit speculative that the court relied on that. If there had been charges brought, we'd be in a different position. I agree, Your Honor. There is nothing in the record that would indicate that that, that those charges were pending. The judge did assign second, or co-counsel, learned counsel for both the defendants early on. Again, in the belief that this was potential for death, eligible charges . . . Separate and apart from the counsel advising them on conflicts? That's correct, Your Honor. Yes. So that he had appointed two attorneys for both defendants, and then he appointed a separate attorney to counsel them with regard to the conflict question. So I think in the court's mind, I don't know that I'd use the word speculative, but that is always the situation for any district judge to have to try to make this assessment early on without knowing exactly how the trial is going to unfold, but I do think his biggest concern was the integrity of the judicial process. So that's . . . when you say that, are you offering that as your own . . . you were there, right? You're offering that as your own perception of it, and the reason I ask that is, when I go back and I look at the transcript of that colloquy, and then I look at the district court's written order on it, in both places, there's a finding, he says, I'm not convinced at all that the waiver is intelligent in knowing. And then he says the same thing, effectively the same thing, in the written order. I certainly think that was his belief, that it was not knowing and intelligent. I don't . . . if it was because of how serious the charges were, that they couldn't intelligently waive their potential conflict in a case like this, really almost an actual conflict, I think, that it's impossible to think that the government wouldn't have wanted the cooperation of one of the defendants. So I think it is . . . I mean, it's just a case where he saw that it's just they couldn't even begin to understand the potential conflict that could arise on such a serious case by being represented by the same attorney. An attorney couldn't even talk to one of the defendants about the possibility or the benefits of cooperating without undermining his representation of the other defendant. So in . . . Do you agree, Ms. Summers, that the standard of review for that first prong is de novo under our case law? I do agree with that, Your Honor. Okay. I think I'm out of time. Do you have a question? Okay. Hearing no further . . . thank you, Ms. Summers, very much. Mr. DiSalvo, we'll give you a couple minutes on rebuttal. Thank you, Your Honor. I just want to quickly touch on the sentencing issue and the Rights Council of Choice issue. So on the sentencing issue, in terms of the testimony about blood being in the bathroom, I think Agent Manns not only testified that he heard it from his investigation, but there's at A-424 testimony that there was blood on the steps and at Appendix 425 that there was a puddle of blood in the bathroom. In terms of the trickles of blood that was discussed outside, it really doesn't tell you the extent of the injury, let alone that it was life-threatening or permanent, because I think as experience would show, getting an injury on the lip or an injury to the ear can bleed a lot, but it doesn't necessarily mean that it's permanent or life-threatening. In terms of the don't-shoot-me statement, I agree with the government that that's not in . . . you can't hear that in the video, but there was testimony about that. It came out very clearly on the stand. It's A-451-452. In terms of the continuing kidnapping, I just want to note that, you know, it's . . . there's . . . in terms of speculation, it's entirely speculative to infer that this series of events unfolded. There's no evidence of what happened after everyone departed the apartment complex, and in fact, it flies in the face of the court's mill order where it said, I'm not going to let the government discuss the whereabouts of Mr. Eastman, because we don't know if it's voluntary or involuntary. It's entirely speculative, and it would be unfairly prejudicial. So the continuing kidnapping evidence should have been out, and it doesn't matter if Eastman has never been seen again for the same reasons. You can't tell what the nature of the injury was if it's entirely speculative where he is. And then in terms of the conflicts issue, Your Honor, there's no law that says that you can't have joint representation just because the charges are serious. And in fact, you know, when it comes to judicial integrity, it has to be based on an actual or serious potential conflict. And as discussed in the briefing and as I discussed in my opening argument, there is no such evidence that there was a serious potential conflict. And when it comes to the death penalty charges, it just shows that there's alternative means, right? Because if there were death penalty charges, it certainly would have derailed the progress towards trial. There would have had to have been a delay, and you could have appointed a new counsel at that point if it happened. Those charges never came. So for those reasons, Your Honor, thank you for your time. Mr. Estable, you're quite welcome. Mr. Hillis, can you hear me from the video? Okay. I just want to put on the record that Attorney Dan Hillis, who is counsel of record for Kenwin Frazier, has, with the agreement of the court, been able to observe these proceedings. And Mr. Hillis, can I confirm that you've both been able to see and hear what's transpired? Yes, Judge. I have. Okay. Very well. With that, Mr. DiSalvo, I'm also aware that you and your firm have accepted this appointment to represent Mr. Frazier on appeal. We very much appreciate that. You've done a fine job, and we appreciate your service to him and the court. Ms. Summers, as always, thanks to you and the government, and we'll take the appeals under advisement.